**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | | |
|---|---|---|
| CONGAREE RIVERKEEPER, INC., | ) | Civil Action Number: 3:15-cv-00194-MBS |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER AND OPINION** |
| vs. | ) | |
| | ) | |
| CAROLINA WATER SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

On January 14, 2015, Plaintiff Congaree Riverkeeper, Inc. ("Plaintiff") sued Defendant Carolina Water Service, Inc. ("Defendant") for violations of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.* (2012). In Claim I, Plaintiff claims that Defendant violated its National Pollutant Discharge Elimination System ("NDPES") permit by failing to connect its wastewater treatment plant ("WWTP") to the regional system. In Claim III, Plaintiff asserts Defendant violated the effluent limitations allowed under Defendant's NDPES permit. Plaintiff moves for summary judgment on Claims I and III. ECF No. 57. Defendant moves for summary judgment on Claim I. ECF No. 58.[1]

On August 1, 2016, the South Carolina Department of Health and Environmental Control ("DHEC") denied Defendant's permit renewal request. ECF No. 64-1. On September 7, 2016, the court issued a text order requiring each party submit a supplemental brief on the impact of DHEC's decision to deny the permit renewal on the present case. Both parties asserted that DHEC's decision not to renew does not affect the current case. ECF No 64 at 5 (Plaintiff's supplemental brief); ECF No. 65 at 1 (Defendant's supplemental brief).

---

[1] Plaintiff consented to dismissal of Claim II at the motion to dismiss hearing held on June 18, 2015. *See* ECF No. 21 at 2.

For the reasons set for below, the court grants Plaintiff's motion for summary judgment and denies Defendant's motion for summary judgment. The court finds there is no genuine issue of material fact that Defendant violated the terms of its NDPES permit by failing to connect to the regional system. The court finds there is no genuine issue of material fact that Defendant exceeded its effluent limitations and Defendant cannot demonstrate the affirmative defense of "upset."

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff is a § 501(c)(3) not-for-profit organization that works to protect and improve the environmental status and recreational uses of the Congaree, Lower Saluda, and Lower Broad Rivers in South Carolina. ECF No. 1 at ¶ 12. Plaintiff's board, staff, and members live near and regularly visit the Lower Saluda River and intend to visit that river in the future. ECF No. 1 at ¶ 14. Defendant owns and operates wastewater treatment plants ("WWTPs") and other associated facilities as a public utility pursuant to South Carolina Code Annotated §§ 58-3-5(6), 58-3-10(4). ECF No. 58-1 at 5. The Public Service Commission of South Carolina ("PSC") has exclusive jurisdiction to regulate public utilities in South Carolina, including the oversight and approval of any agreement or contract affecting a public utility's ability to provide sewer service to citizens. ECF No. 58-1 at 6 n.6. PSC issued Defendant's WWTPs operating certificates of public convenience and necessity. ECF No. 58-1 at 5.

Central Midlands Counsel of Governments ("CMCOG") is tasked with conducting water quality planning and management for the Midlands region of South Carolina. *See* ECF No. 58-1 at 3-4. The Town of Lexington ("Town") falls within the Midlands region and was chosen as the Designated Management Agency ("DMA") and regional provider of wastewater collection by the CMCOG, in consultation with the governor, pursuant to 33 U.S.C. § 1288(a). ECF No. 58-1

at 4 n.3. DHEC has the overarching responsibility of regulating activities affecting water quality and establishing classifications and standards. DHEC's issues NDPES permits. Any DHEC decision may be appealed to an administrative law court ("ALC"). The ALC decision may then be appealed to the South Carolina Board of Health and Environmental Control ("Board"). Finally, any Board decision may be appealed to a South Carolina circuit court.

In 1979, pursuant to CWA § 208, 33 U.S.C. § 1288, CMCOG drafted *The 208 Water Quality Management Plan for the Central Midlands Region* (the "208 Plan") a waste treatment and water quality plan for the region. The 208 Plan was most recently updated in 2004. In the 208 Plan, CMCOG states a general policy to consolidate smaller facilities into regional systems. ECF No. 58-1 at 4.[2] A 1993 revision of the 208 plan designated a facility owned by the City of Cayce, South Carolina, as the regional treatment facility ("RTF") that would service the Midlands region. ECF No. 58-1 at 5.

Defendant owns and operates a WWTP in Lexington County, South Carolina, known as the I-20 Plant. *Id.* DHEC issued NPDES Permit No. SC0035564 ("the Permit") to Defendant on November 17, 1994, (effective January 1, 1995). ECF No. 57 at 4. The Permit was modified in April 1996 and was due to expire on September 30, 1999. ECF 57-1. The Permit authorizes Defendant to discharge wastewater from the I-20 Plant into the Lower Saluda River subject to effluent limitations and monitoring requirements. Importantly, the Permit provides that "[i]n accordance with the [208 Plan], the [I-20] facility is considered a temporary treatment facility that will be closed out when the regional sewer system is constructed and available." ECF No.

---

[2] "Small, public or private domestic wastewater treatment facilities are considered temporary facilities. When a regional wastewater collection system, public or private, becomes available, these facilities will be required to connect to that system." 208 Plan at 44.

3

57-1. Defendant's permit was to expire when the regional system received its permit to operate. *Id.*

On April 7, 1999, Town completed construction on the regional sewer line and received a Permit to Operate from DHEC. ECF No. 58-1 at 6. On April 21, 1999, DHEC informed Defendant and Town that the regional system received its permit to operate and that Defendant's construction permit to connect to the regional system was approved. ECF Nos. 65-4, 65-5. Town and Defendant were unable to agree on the terms of a connection. ECF No. 65 at 2. Defendant never constructed the pipeline to connect to the regional system. *Id.* On July 16, 1999, and August 24, 1999, Defendant sought a major modification to the Permit that would allow the I-20 Plant to continue operating indefinitely as Defendant negotiated with Town and sought PSC approval to connect to the regional system. ECF 61-2 at 24–25. DHEC denied Defendant's major modification requests on the basis that Defendant did not provide good cause for its requests. ECF 61-4 at 2. In February 2000, DHEC found that Defendant was in violation of the Permit due to Defendant's failure to connect to the regional system and for exceeding permitted discharge levels. ECF No. 61-5. In February or March 2000, Defendant appealed denial of the modification, denial of permit reissuance, and issuance of violations to the ALC. *See Carolina Water Service v. S.C. Dept. of Health and Environ. Control*, No. 99-ALJ-07-0450, 2002 WL 385126 (S.C. Admin. L. Judge Div. Feb. 25, 2002) [hereinafter 2002 ALC Decision].

In July 2000, DHEC and Town entered into an agreement that (1) noted Town's regional system had insufficient capacity to handle the wastewater from Defendant's system, (2) noted PSC must approve any agreement between Town and Defendant, and (3) required Town to offer Defendant a contract by August 5, 2000. ECF No. 65 at 3. Town and Defendant came to an agreement and submitted said agreement to PSC (Docket No. 2000-425-S); however, Defendant

withdrew the agreement from consideration in January 2001 pending consideration of Defendant and Town's joint amendment to the 208 Plan. *Id.* The amendment from Defendant and Town proposed that the I-20 Plant be designated as a permanent treatment facility and not be required to connect to the regional facility. *Id.*

On March 22, 2001, CMCOG approved the joint amendment to the 208 Plan. ECF No. 58-1 at 7. However, DHEC refused to certify the amendment. ECF No. 58-1 at 7. In August 2001 Defendant, Town, and CMCOG filed a petition in the ALC protesting DHEC's refusal to certify the proposed amendment. The Lexington County Joint Municipal Water and Sewer Commission intervened. *See CMCOG v. DHEC*, Nos. 01-ALJ-07-0363-CC, 01-ALJ-07-0364-CC, 01-ALJ-07-0365-CC, 01-ALJ-07-0433-CC, 2002 WL 31716469 (S.C. Admin. L. Judge. Div. Oct. 22, 2002).

On February 25, 2002, the ALC issued a decision on Defendant's appeal of DHEC's denial of the modification, denial of permit reissuance, and issuance of violations. The ALC deferred to CMCOG's finding that Defendant was in conformance with the NDPES permit until February 24, 2000, because the regional system was not available for connection. *Carolina Water Service*, 2002 ALC Decision at *4, *6. Further, the ALC modified the permit compliance schedule requiring Defendant connect to the regional system. *Id.* at 9. Essentially, the ALC ordered that Defendant was under an "on-going obligation to negotiate an agreement and to continue to seek an agreement between [Defendant] and [Town] that will be approved by the PSC." *Id.* at 10. The order then states specific timeframes if PSC approves of an agreement. Alternatively, the ALC held that if PSC denies the connection agreement, then the permit will expire after one hundred-eighty days of the final PSC Order. *Id.*

Defendant and DHEC both appealed to the DHEC Board. *Carolina Water Service v. S.C. Dep't of Health and Environ. Control*, No. 99-ALJ-07-0450, ECF No. 16-3 (DHEC Board Order

March 15, 2004) [hereinafter 2004 Board Order]. The DHEC Board reversed the ALC's holding that Defendant's permit would expire one hundred-eighty days after a PSC denial but otherwise affirmed the ALC's amended schedule to connect to the regional system—including Defendant's on-going obligation to negotiate with Town for an acceptable contract. *Id.* at 5.

In 2002, Defendant submitted the 2000 interconnection agreement to PSC for approval, with modifications to the customer rate. PSC refused to approve the interconnection, finding the proposed agreement against the public interest. *In re Application of Carolina Water Service*, No. 2002-147-S, 2003 WL 26623818 at *5 (S.C.P.S.C. 2003). PSC found that Defendant agreed to pay too high a rate for the service received and Defendant's customers, in effect, would subsidize the regional system. *Id.* at 6. PSC denied Defendant and Town's alternative plan, which would sell one of Defendant's other facilities and designate the I-20 Plant as a permanent treatment facility. *Id.*

In August 2009, the City of Cayce, Town, and the Lexington County Joint Municipal Water and Sewer Commission entered into a contract to expand the capacity of the Cayce regional treatment plant. *See* ECF No. 58-3. The construction of the expansion was financed through issuance of tax-exempt bonds with restrictive covenants designed to preserve the bonds' tax-exempt status.[3] ECF No. 58-3 at 38–39. One condition is a restriction on the amount of wastewater from "Private Business Use" that can be treated. *Id.* "Private Business Use" includes a private utility like the I-20 Plant. *Id.*; *see also* ECF No. 58-1 at 9. Town covenanted that it would not enter into any contract or agreement for sale of its wastewater services or allocated capacity that constitutes a "Private Business Use." ECF No. 58-3 at 39. If Town contracted with another party for activity that constituting "Private Business Use," the contract "may cause the

---

[3] As this was in 2009, Town knew of Defendant's requirement to connect to its regional system.

6

interest on [b]onds to be included in the gross income of the holders," thereby, extinguishing the bonds' tax-exempt status. *See* ECF No. 58-3 at 38.

Defendant did not engage in negotiations with Town after the denial by PSC in 2003 until 2014, after Plaintiff served its notice of intent to sue under the CWA. *See* ECF No. 58-1 at 8. In July 2012, Defendant again inquired into making the 1-20 Plant into a permanent facility and stated to DHEC that it had not had "any recent discussions with [Town] about hooking up to [the regional] system." ECF No. 57-4.

On November 6, 2013, Plaintiff served on Defendant and DHEC notice of intent to sue under the CWA. ECF No. 58-1 at 10. Plaintiff asserted that Defendant was in violation of NPDES Permit SC0035564 since it has failed to eliminate its discharge into the Saluda River. ECF No. 58-1 at 10.

On March 21, 2014, Defendant initiated negotiations with Town regarding a possible connection to the regional system. No. 58-5. On May 8, 2014, Town responded that it was not interested in an interconnection at the time. ECF No. 7-10.

On July 31, 2014, Defendant and Town entered into a confidentiality agreement to negotiate a sale of the I-20 Plant. ECF No. 58-6. Town was interested in acquisition of the I-20 Plant only if it also acquired another facility owned by Defendant, the Watergate system. ECF No. 58-7. Before engaging in further negotiations Defendant requested a non-binding letter "indicating that a $13.5 Million price is within a reasonable range of value that the Town would be willing to consider paying." *Id.* Town declined to enter into a non-binding letter of agreement, stating it was unable to determine if that price was within a reasonable range without other information. ECF No. 58-7. Defendant provided Town with maps of the system, as requested. ECF No. 58-7. In December 2014, Defendant provided Town with additional information on the

number of customers, yearly revenue, yearly costs, and other data. ECF No. 58-8. Town did not respond to Defendant about the proposed price and did not make an offer for the systems. ECF No. 58-1 at 11.

In July 2015, Defendant submitted a draft permit renewal to DHEC, which sought to add that "[t]o connect to the Town DHEC recognizes that [PSC] must approve an agreement related to connection to the regional sewer line." ECF No. 65-8 at 34. DHEC issued a fact sheet noting that Defendant would need PSC approval and that DHEC does not have the authority to force Defendant and Town make a connection agreement. *Id.* at 41. On August 25, 2015, DHEC held a public hearing to elicit public feedback on Defendant's permit renewal request. ECF No. 65 at 7. Approximately 285 individuals attended the hearing, including numerous public officials. ECF No. 64 at 3. Almost all attendees advocated for denial of the renewal permit. *Id.*; ECF No. 58-18 at 4.

On September 3, 2015, Defendant unilaterally filed an application with PSC seeking approval of an interconnection agreement at the wholesale treatment rate Town charged Defendant for another system. ECF No. 34-1 (PSC Docket No. 2015-327-S). Defendant did not seek Town's approval before submitting the application. ECF No. 58-10 at 2.

On September 4, 2015, DHEC issued a notice of intent to deny the renewal permit. ECF No. 33-1 at 1. DHEC determined Defendant was ineligible for a permit renewal because Defendant's permit required Defendant to connect to the regional system once the system was operational and Defendant failed to do so. ECF No. 33-1 at 1.

On September 9, 2015, Defendant sent Town a letter requesting interconnection on the terms set forth in the September 3, 2015, application. ECF No. 58-9. Town declined any interest in an interconnection agreement as the terms did not accurately reflect current costs. ECF No.

8

58-10 at 2–3. Town indicated a continued interest in acquisition of the I-20 Plant, but only if Defendant agreed to pay a portion of Town's due diligence. ECF No. 58-1 at 12-13. Defendant responded that it was not interested in such an agreement. ECF No. 58-1 at 12.

On November 10, 2015, South Carolina Office of Regulatory Staff organized a meeting to facilitate negotiations between Defendant and Town. ECF No. 65 at 8. At this meeting, Town's limiting contractual and bond covenants were discussed. *Id.* In January 2016, Defendant's PSC application was dismissed without prejudice. *See* ECF No. 65-8 at 74. Between April 2016 and July 2016, DHEC conducted numerous mediation sessions between Defendant and Town. ECF No. 65 at 9.

On August 1, 2016, DHEC formally denied Defendant's permit renewal request. ECF No. 64-1. As part of DHEC's denial, DHEC required Defendant and Town submit a coordinated plan for Defendant to connect to the regional treatment facility within sixty days. ECF No. 64-2 at 5. If DHEC did not approve that plan, an amended plan must be resubmitted within fifteen days. *Id.* Finally, Defendant's plant must be connected to the regional system and cease discharge within twelve months. *Id.* Defendant appealed denial of permit reissuance to ALC on September 21, 2016. ECF No. 65 at 10.

To date, there has been no interconnection agreement or acquisition agreement for the I-20 Plant and Defendant continues to discharge water into the Saluda River. Defendant is permitted limited discharges into the Saluda River. Defendant has exceeded those discharge limits twenty-three times between 2009 and 2013. ECF No. 1-3.

## II.     LEGAL STANDARD

The court shall grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The judge

does not weigh evidence but determines if there is a genuine issue for trial. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). The party seeking summary judgment bears the initial burden of coming forward and demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party must affirmatively demonstrate that there is a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court should grant summary judgment if a party fails to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

## III.    ANALYSIS

Plaintiff moves for summary judgment on Claims I and III. Plaintiff argues that there is no genuine issue of material that (1) Plaintiff has standing to sue, (2) Defendant was required to connect to the regional treatment facility under the 1994 Permit, and (3) Defendant violated the effluent limitations requirement on twenty-three occasions. Defendant moves for summary judgment on Claim I. Defendant claims there is no genuine issue of material fact that (1) Plaintiff lacks standing, (2) Plaintiff is barred by the statute of limitations, (3) the 2002 modifications to the permit apply and Defendant is in compliance with the modified terms, or if the 1994 Permit applies, Defendant is in compliance with the 1994 Permit as well. Defendant argues there is a genuine issue of material fact whether it has an "upset defense" to its effluent limitations violations.

## A. **Claim I: Violation of Connection Requirement**

### 1. **Plaintiff Not Barred by Statute of Limitations**

Defendant asserts that the alleged violation of failure to connect occurred more than five years prior to the filing of the complaint; therefore, Plaintiff's action is barred by the statute of limitations. At the motion to dismiss stage, the court held that the violation is ongoing, thus not barred by the statute of limitations.

> Defendant also argued that Plaintiff's first cause of action was barred by the five-year statute of limitations contained in 28 U.S.C. § 2462. Plaintiff countered that the alleged violation was a continuing violation. Citizen-plaintiffs show an ongoing violation "either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations. Intermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of repetition." *Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.*, 844 F.2d 170, 171–72 (4th Cir. 1988). Assuming for the purposes of the motion to dismiss that Defendant's failure to connect its facility to the regional system is a violation of the permit, the Court concluded that the violation as alleged is ongoing because discharge from the facility is alleged to be regularly entering the Lower Saluda River.

ECF No. 21.

The court declines to disturb its prior holding. Plaintiff is not barred by the statute of limitations as the failure to connect is an ongoing violation.

### 2. **Standing**

At the motion to dismiss stage, the court stated that Plaintiff had standing and denied Defendant's motion to dismiss without prejudice. Defendant moves for summary judgment that Plaintiff lacks standing. Plaintiff must demonstrate that it has standing to bring the case. Plaintiff asserts associational standing. To demonstrate associational standing, Plaintiff must show "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the

relief requested requires the participation of individual members in the lawsuit." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

A member has standing to sue in their own right where he or she can establish the three elements of Article III standing: (1) injury, (2) traceability, and (3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff bears the burden of establishing injury, traceability, and redressability. *Id.* at 560–61. Plaintiff asserts that its members have "suffered injuries that are fairly traceable to the discharges from the [I-20 Plant], and a court order would redress these injuries." ECF No. 57 at 9. Defendant argues that Plaintiff fails to demonstrate that the alleged injuries were caused by Defendant rather than third parties not before the court, Town and PSC. Defendant next argues that Plaintiff fails to demonstrate that its injuries would be redressed by a favorable decision, because redressing Plaintiff's alleged injury involves third parties, Town and PSC. ECF No. 58-1 at 31–32. For the reasons set forth below, the court finds that Plaintiff's injuries are traceable to Defendant and can be redressed by this court.

a. Injury

To demonstrate legal "injury," the plaintiff "must have suffered 'an injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S. at 560 (internal citations omitted). In an environmental case, "plaintiffs adequately allege injury when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area [are] lessened'" by the alleged activity. *Friends of the Earth, Inc. v. Laidlaw Environ. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (stating that plaintiffs who avoid using the portion of the

12

river due to concerns about discharges from the facility sufficiently allege injury). Mere speculative intentions, such as the intent to visit the area "someday" are insufficient to demonstrate a concrete injury. *See Lujan*, 504 U.S. at 564.

Here, Plaintiff's members specify their use of the river and their attempts to avoid the river in the area of the I-20 Plant discharge pipe. Regan Norris often fishes and kayaks in the Lower Saluda River; however, he tries to avoid kayaking near the discharge pipe and is concerned about eating fish from the river. ECF No. 15-2 at ¶¶ 5–6. Amanda Odum avoids kayaking and canoeing in the Lower Saluda River near the I-20 Plant discharge pipe. ECF No. 15-3 at ¶ 6. Bill Stangler uses the Lower Saluda River but avoids contact with water near the I-20 Plant discharge pipe. ECF No. 15-4 at ¶ 3–4. Hartley Barber owns a tour guide company that provides guided tours of the Lower Saluda, and tells clients to avoid that section of the river when the pipe is discharging wastewater. ECF No. 15-5 at ¶¶ 3–5. Each of the Plaintiff's members also state aesthetic issues with the water's appearance and smell.

Defendant makes a conclusory statement that Plaintiff has not shown sufficient injury. ECF No. 58-1 at 31 n.28. Defendant attempts to cast Plaintiff's cited declarations as lacking personal knowledge and offering legal conclusions. ECF No. 60 at 25. The court disagrees. Plaintiff has demonstrated that its members use the affected area, thus have personal knowledge, and that they avoid the area due to aesthetic and health concerns. Plaintiff has demonstrated injury.

b. Traceability

To demonstrate "traceability," the plaintiff must show "a causal connection between the injury and the conduct complained of [that is] fairly trace[able] to the challenged action of the defendant, and not . . . . th[e] result [of] independent action by some third party." *Id.* In

environmental cases, the plaintiff does not need to "show to a scientific certainty that the defendant's actions caused the precise harm." *S.C. Wildlife Fed'n v. S.C. Dep't of Trans.*, 485 F. Supp. 2d 661, 670 (D.S.C. 2007). A plaintiff "need not show that a particular defendant is the only cause of their injury." *Nat. Res. Def. Council, Inc. v. Watkins*, 954 F.2d 974 (4th Cir. 1992). However, a plaintiff must demonstrate there are not "independent actors not before the court[] and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Lujan*, 504 U.S. at 560.

First, the harm is traceable to Defendant. Defendant is discharging treated wastewater into the Saluda River. While there may be additional businesses discharging into the Saluda River, Plaintiff's members specifically noted the area around Defendant's discharge pipe in their affidavits. *See* affidavits cited *supra* Section III.a.ii.1.This aesthetic injuries are traceable to Defendant. Second, while there is more than one party required to connect the I-20 Plant to the regional system, the harm is still traceable to Defendant. The Permit puts the onus on Defendant to provide a satisfactory agreement for PSC's approval. The prior denials demonstrate what PSC will find acceptable in a proposed agreement. Further, Defendant has the obligation to contract with Town or take other measures to fulfill the Permit requirements. Defendant has kept its plant open for seventeen years after it was required to connect. While regional connection does require other actors' assistance and approval, Defendant cannot be rewarded for its lack of a good faith effort to engage in negotiations and receive the required approvals. The court finds that the independent actors' behavior is sufficiently predictable. The court finds that Plaintiff's injury is traceable to Defendant's actions.

c. Redressability

Lastly, to demonstrate "redressability," the plaintiff must demonstrate that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561. The redressability requirement ensures that the plaintiff would personally benefit in a tangible way from the court's intervention. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 162 (4th Cir. 2000) (citing *Warth v. Seldin*, 422 U.S. 490, 508 (1975)). A plaintiff must demonstrate standing separately for each form of relief sought. *See, e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) (observing that notwithstanding the fact that plaintiff had standing to pursue damages, he lacked standing to pursue injunctive relief); *see also Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("[S]tanding is not dispensed in gross."). Plaintiff seeks an injunction and civil penalties. ECF No. 1 at 16.

i. *Injunctive Relief*

A plaintiff seeking injunctive relief demonstrates redressability by alleging a "continuing violation or the imminence of a future violation" of the statute at issue. *Friends of the Earth, Inc.*, 204 F.3d at 162 (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998)). However, if the redress requires action by a third party, it does not fulfill Article III redressability. *Lujan*, 504 U.S. at 569. For example, in *Lujan*, the requested relief required consultation between the defendant and third party agencies that were not before the court. *Id.* As an example, the Court of Appeals for the Fourth Circuit in *Friends for Ferrell Parkway* found that the Fish and Wildlife Service ("FWS") was not the proper defendant because (1) a private third party contracted to sell the land to FWS, (2) the alleged injuries were not due to FWS's intent to create a sanctuary, and (3) a third party city would have to develop the land. *Friends for Ferrell Parkway, LLC v. Stasko et. al*, 282 F.3d 315, 324 (4th Cir. 2002). Therefore, any relief

15

granted against defendant FWS would have no impact on the plaintiff's alleged injuries. *Id.*; *see Frank Krasner Enter. Ltd. v. Montgomery Cty.*, 401 F.3d 230 (4th Cir 2005) (finding that third party was not before the court and court could not compel third party to rent space or subsidize plaintiff).

Plaintiff asserts that, as to Claim I, redressability is shown by alleging a continued or imminent violation. ECF No. 57 at 11; *see also Gaston Copper*, 204 F.3d at 154. Defendant argues that an injunction by this court for a sale, connection agreement, eminent domain action, condemnation, or closure of the facility is too speculative or dependent upon third parties to suffice the redressability requirement of standing. Defendant asserts that any agreement for connection requires a contract with Town and PSC approval. Lastly, Defendant asserts that as Town and PSC are not before the court, the court cannot order Town to condemn the property. The court disagrees with Defendant. In *Ferrell Parkway*, there were numerous other actors who needed to take action counter to their stated plans, *i.e.*, the city's sale of the land demonstrated that it did not intend to develop the land. Here, the parties are in negotiations for the connection of the I-20 Plant to the regional system. The court need not compel the parties to take action counter to their stated plans. The court may issue an injunction dictating a specific time to connect to the regional plant that provides sufficient time for Defendant to contract with Town and seek PSC approval. Relief for Plaintiff is not too speculative or dependent upon third parties.

### ii.    Civil Penalties

Plaintiff alternatively requests civil penalties, *i.e.*, monetary relief. "All civil penalties have some deterrent effect." *Hudson v. United States*, 522 U.S. 93, 102 (1997). Civil penalties under the [CWA] do more than incentivize immediate compliance, they also deter future violations. *Laidlaw*, 528 U.S. at 186. Defendant argues standing for civil penalties for Claim I

suffers the same defect as standing for an injunction. Should the court impose a civil penalty on CWS for not connecting and ceasing discharges, Defendant's compliance to avoid future penalties would still be subject to an agreement with various third parties not bound by an order of the court. Defendant has continued to engage in profitable activity, in violation of its permit, for seventeen years. The court finds that an imposition of civil penalties is not inequitable. Such penalties would be an incentive for Defendant to engage in further negotiations with Town. Accordingly, civil penalties would redress Plaintiff's injuries.

The court finds that element "(a)" of standing is met, Plaintiff has demonstrated injury, traceability, and redressability. As to element "(b)," Plaintiff's purpose is "protecting the natural environment and public health." ECF No. 57 at 12. As this matter involves water pollution, it is germane to the association's purpose. As to element "(c)," individual participation is not required as the relief sought is compliance with the NDPES permit, not private damages or injunctions tailored for the individual plaintiff. *Id.* at 12–13. The court finds that Plaintiff meets elements (b) and (c). Plaintiff has organizational standing.

### 3. *Buford* Abstention

In a footnote, Defendant argues the *Burford* abstention doctrine applies. ECF No. 58-1 at 30 n.27.[4] *See Palumbo v. Waste Tech. Indus.*, 989 F.2d 156, 160 (4th Cir. 1993) (abstaining where Attorney General should have raised issue on direct appeal or to the Clean Air Act regulatory bodies). *Burford* abstention permits a federal court to dismiss a case only if it presents "difficult questions of state law bearing on policy problems of substantial public import whose

---

[4] Defendant is cautioned from making arguments in footnotes, while it saves space, arguments contained within footnotes are generally considered with less force and make briefings difficult to read.

importance transcends the result in the case then at bar" or if it "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976*); see Ohio Valley Envtl. Coal. Inc. v. Maple Coal Co.*, 808 F. Supp. 2d 868 (S.D.W. Va. 2011) (holding that *Burford* does not apply as the issue was whether the West Virginia agency complied with CWA permit modification requirements). Here, similar to *Ohio Valley*, Plaintiff is asserting that DHEC did not comply with CWA permit requirements and accordingly is asserting that Defendant is not complying with the validly issued 1995 Permit. The case does not bear on difficult questions of state law, instead it bears directly on implementation of federal law. Nor is the case disruptive of state efforts to establish a coherent policy regarding NDPES permitting systems. *Burford* abstention does not apply.

### 4. Violation of the CWA

The CWA is a strict liability statute. The court must determine which permit applies, the terms of the applicable permit, and whether Defendant violated those terms.

#### a. 2002 Modifications

The first issue is whether the Defendant may assert that the terms stated in the 2002 ALC Decision govern whether there was a violation. Plaintiff argues that Defendant cannot argue the 2002 ALC Decision modified Defendant's requirements because Defendant has "consistently and repeatedly admitted in prior filings to this Court that the 1995 Permit is *the* operable permit, and that its language controls liability." ECF No. 59 at 4 (emphasis in original). Plaintiff asserts that under the "law of the case" doctrine, Defendant is prohibited from modifying its argument. ECF No. 59 at 5. Defendant argues that the court's "jurisdiction to entertain citizen suits for alleged violations of NDPES Permits only extends to the terms of the permit which is 'in effect'

at the time that the citizen suit is brought," and the 2002 modifications were the terms in effect. ECF No. 61 at 5. Defendant further argues that Plaintiff misstates the "law of the case" doctrine, and that it is inapplicable to factual allegations. ECF No. 61 at 6.

"Law of the case" doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999) (citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988). The court has not made a determination of whether the 1995 Permit or 2002 modifications apply. "Law of the case" doctrine is inapplicable.

However, the rule of judicial admission may apply. Under the rule of judicial admission, "a party is bound by the admissions of his pleadings." *Lucas v. Burnley*, 879 F.2d 1240, 1242 (4th Cir. 1989). A judicial admission is a "representation that is 'conclusive in the case'" such as "formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them." *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 347 (4th Cir. 2014) (citing *Meyer v. Berkshire Life Ins. Co.*, 372 F.3d 261, 264 (4th Cir. 2004). In *Lucas* the Fourth Circuit Court of Appeals found that there was a binding judicial admission where the issue was raised in the complaint and admitted in the answer. *Id.*; *see also Brown v. Sikora & Assocs., Inc.*, No. 04-0579, 2007 WL 1068241, at *4 (D.S.C. Mar. 30, 2007) (finding that admission in amended answer and cross-claim was binding on the party), *aff'd* 311 F. App'x 568 (4th Cir. 2008). However, a judicial admission is only binding if the statement is "deliberate, clear, and unambiguous." *Everett v. Pitt. Cty. Bd. of Educ.*, 788 F.3d 132, 141 (4th Cir. 2015); *see Fraternal Order of Police Lodge No. 89 v. Prince George's Cty.*, 608 F.3d 183, 189–90 (4th Cir. 2010) (finding that party did not make judicial admission where party could have only

preserved its objection "by continuing to argue with the court after it has already forcefully
rejected" the position).

Plaintiff asserts that the below referenced language demonstrates Defendant's admission
that the 1995 Permit applies to this matter:

> The Answer filed by CWS admits that the 1995 Permit is the relevant
> document in this case, stating that its "discharge is authorized pursuant to" the
> discharge permit issued by DHEC "November 17, 1994 ('NPDES Permit
> SC0035564')," with a copy of the 1995 Permit "attached hereto and
> incorporated herein by reference as Answer Exhibit 'A.'" Dkt. 8 (Answer) at ¶
> 2. *The 1995 Permit referenced in and attached as Exhibit A to the Answer is
> identical to the Permit referenced in and attached to the Complaint.*
>
> . . . . The Answer goes on to repeatedly reference the language of the attached
> 1995 Permit as controlling. *See, e.g., id.* at ¶ 39 ("Defendant *admits . . . that
> NDPES Permit No. SC0035564 requires that the I-20 WWPT be closed out . .
> . .*"); *id.* ("Defendant affirmatively asserts that *NPDES Permit SC0035564 on
> its face*" recognizes the I-20 Plant as regional facility); *id.* at ¶ 52 ("Defendant
> craves *reference to NPDES Permit SC0035564 for its content* and denies any
> allegation [] inconsistent *with the language of same*.") (emphases added). The
> only version of NPDES Permit SC0035564 referenced in, discussed in, and
> attached to the Answer is the 1995 Permit.

ECF No. 59 at 6–7 (emphases in original).

Plaintiff further points out that in Defendant's motion to dismiss, Defendant stated that
"[t]he I-20 WWTP is authorized to operate and discharge wastewater into the Lower Saluda
River pursuant to a discharge permit issued by [DHEC] in accordance with [NDPES] under the
[CWA] and provisions of South Carolina law. *See* Exh. A, 'NDPES Permit SC0035564,' issued
Nov. 17, 1994." ECF No. 7-2 at 3. Defendant argues that Plaintiff fails to point to a "deliberate,
clear, and unambiguous statement that [Defendant] intended to waive the application of the
modified terms of the schedule of compliance." ECF No. 61 at 7. Additionally, Defendant
focuses on the requirement that the court apply the permit "which [is] 'in effect' at the time the
citizen suit is brought." ECF No. 61 at 5.

In discussing whether an injunction may be granted where there are "wholly past" violations, the Supreme Court in *Gwlatney of Smithfield Ltd. v. Chesapeake Bay Foundation, Inc.*, held that "[a] citizen suit may be brought only for violation of a permit limitation 'which is in effect' under the act." 484 U.S. 49, 59 (1987) (citing 33 U.S.C. § 505(f)). Defendant interprets this to mean that the court must apply the permit in place at the time the complaint was filed. The court disagrees with Defendant's interpretation. The court finds that the *Gwlatney* court was merely stating that the violations of the permit cannot be wholly in the past, *i.e.*, there must be a chance of violations in the future. *Id.* at 59. The Court did not address which permit out of two or more options would apply.

The court finds that judicial admission does not apply. Defendant did not explicitly state that the 1995 Permit is the only applicable permit, Defendant merely responded (and denied) the complaint's allegations based on the 1995 Permit, there does not appear to be a clear and unambiguous waiver.

### b.   Modification Procedures

Plaintiff next argues that the 2002 modifications cannot apply because the modifications fail to follow the proper procedure under the CWA. ECF No. 59 at 9. Federal and state regulations govern the modification of NDPES permits.[5] *See Citizens for a Better Env't-CA v. Union Oil Co. of CA*, 83 F.3d 1111, 1120 (9th Cir. 1996). The applicable regulations require (1) a draft permit, (2) accompanying fact sheet setting forth the factual, legal, and policy questions considered while drafting the permit, (3) public notice and comment period, and (4) the opportunity to request a public hearing. *See* 40 C.F.R. §§ 122.62, 124.5–124.12; S.C. Code Regs.

---

[5] Requests for modifications of NDPES permits follow the same procedures as requests for new permits. 40 C.F.R. §§ 123.25(a)(22) & (a)(25).

§§ 61-9-125.5 to 125.13. "These regulations, both procedural and substantive, ensure that the standard embodied in an NDPES permit cannot be evaded with the cooperation of compliant state regulatory authorities. For instance, there are public notice requirements for a permit modification process . . . ." *Citizens for a Better Env't-CA*, 83 F.3d at 1120. Under 40 C.F.R. § 124.6(e)

> [a]ll draft permits prepared by EPA under this section shall be accompanied by a statement of basis or fact sheet, and shall be based on the administrative record, publicly noticed, and made available for public comment. The Regional Administrator shall give notice of opportunity for a public hearing, issue a final decision, and respond to comments.

(internal citations omitted). In *United States v. Smithfield Foods Inc.*, the Fourth Circuit Court of Appeals affirmed the district court's finding of improper modification because "[the defendant] did not follow the procedures required for the modification of a permit, and none of the Board's Special Orders and letters were issued in accordance with the permit modification procedures." 191 F.3d 516, 524 (4th Cir. 1999) (quoting *United States v. Smithfield Foods Inc.*, 965 F. Supp. 769, 787–88 (E.D. Va. 1997)); *see also Waterkeeper Alliance, Inc. v. U.S. Envtl. Prot. Agency*, 399 F.3d 486, 503 (2d Cir. 2005); *Proffitt v. Rohm & Haas*, 850 F.2d 1007, 1013 (3d Cir. 1988); *Citizens for a Better-Env't-CA*, 83 F.3d at 1120. If a permit modification fails to comply with the modification procedures, especially public participation, the lawsuit will proceed on the terms of the original permit. *Riverkeeper, Inc. v. Mirant Lovett LLC*, 675 F. Supp. 2d 337, 346 (S.D.N.Y. 2009).

Defendant argues that it followed proper state procedures and Plaintiff's argument amounts to an improper collateral attack on state administrative procedures. ECF No. 61 at 8. Defendant attempts to distinguish *Smithfield Foods* and *Citizens for a Better Environment* by asserting that neither defendant had sought a modification order, the terms were changed after

violations by either the applicable water board or a court. The court finds Defendant's attempt to distinguish unsuccessful. In both *Smithfield Foods* and *Citizens for a Better Environment* state administrative action failed to comply with federal and state procedures, which is the same as the present case. The pertinent issue is whether the modification procedures were followed in full, which was not done in this case.

Finally, Defendant asserts that because its modification request was initially denied, it no longer has to comport with the modification requirements of 40 C.F.R. § 124.5: "Denials of requests for modification, revocation and reissuance or termination are not subject to public notice, comment, or hearings." *See* 40 C.F.R. § 124.5(b). This is inapposite. The regulation merely states that if the permit modification is denied, the issuing body does not need to hold a public hearing. If the permit is going to be denied, it does not change the status quo and public input in unnecessary. However, if there is a modification to the permit, there must be a public hearing (if sufficient public interest). Accordingly, the proper procedure would have Defendant appeal the denial to modify to the Board, the Board overrule the denial and then submit the request to a public notice and comment period. The court finds proper modification procedures were not followed; therefore, the 1995 Permit applies.[6]

### c.   Violation of 1995 Permit

#### i.   *Interpretation of 1995 NDPES Permit*

To interpret a provision of an NDPES permit, the court uses the same manner of interpretation as it would interpreting contracts or other legal documents. *Piney Run Pres. Ass'n v. Cty. Comm'rs of Carrol Cty.*, 268 F.3d 255, 269 (4th Cir. 2001). If "'the language is plain and

---

[6] As the 1995 Permit applies, the court declines to consider whether the 2002 modifications violated the CWA's anti-backsliding rule.

capable of legal construction, the language alone must determine' the permit's meaning." *Id.* at 270 (citing *FDIC v. Prince George Corp.*, 58 F.3d 1041, 1046 (4th Cir. 1995)). "[E]xtrinsic evidence may only be considered if the contract is ambiguous." *Pres. Capital Consultants, LLC v. First Am. Title Ins. Co.*, 751 S.E.2d 256, 261 (S.C. 2013). Lastly, an NDPES permit must be interpreted to give full meaning and effect to all of its provisions and avoid focusing on a few isolated provisions. *Nat'l Res. Def. Counsel v. Cty. of Los Angeles*, 725 F.3d 1194, 1206 (9th Cir. 2013). However, if the terms of the permit are "ambiguous," the court "must look to extrinsic evidence to determine the correct understanding of the permit." *Id.* at 270 (citing *Northwest Environ. Advocates v. City of Portland*, 56 F.3d 979, 983 (9th Cir. 1995)). A term in a permit is ambiguous "if reasonable people could find its terms susceptible to more than one interpretation." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir 1999). "[A]n interpretation which gives reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." Restatement (Second) of Contracts § 203(a) (1981). It is a question of law whether the language of a contract is ambiguous. *S.C. Dep't of Nat. Res. v. Town of McClellanville*, 550 S.E.2d 299, 302–03 (S.C. 2001).

The language at issue in paragraph 3(c) of the NDPES permit states:

> Within 90 days after the issuance date of the Permit to Operate for the regional sewer system, the Permittee will connect to the regional sewer system and cease the discharge to the Saluda River. This permit will expire on the date of issuance of the Permit to Operate the connection between this facility and the regional sewer system. In accordance with the Area Wide 208 Management Plan, this facility is considered a temporary treatment facility that will be closed out when the regional sewer system is constructed and available.

NPDES Permit No. SC0035564, ECF No. 57-1 at 8.

The terms in question are "connect" and "available." The court finds that both "connect" and "available" are ambiguous terms with reasonable interpretations by both parties. Therefore, the court will look to extrinsic evidence to determine the meaning of the terms. Additionally, the court considers the permit in regard to the CWA's purpose, which is to eliminate discharges from the nation's waterways. 33 U.S.C. § 1251.

(1) Connect

Plaintiff argues that the term "connect" "does not specify any required means of connection – *e.g.*, through an interconnection agreement with the Town of Lexington; a sale of the I-20 Plant to the Town of Lexington; or other means, such as hostile or friendly condemnation." ECF No. 57 at 5. Plaintiff states the Permit's requirements are to "[1] connect to the regional sewer system and [2] cease discharge to the Saluda River" "[w]ithin 90 days after the issuance of the Permit to Operate for the regional system." ECF No. 57 at 13. Plaintiff asserts that the Permit provides no caveats such as "if feasible" or "when an interconnection agreement is approved by [PSC]." ECF No. 57 at 15. Plaintiff argues that the term "interconnection" as used by Defendant is too narrow of a reading as it only "denotes a bulk-services agreement whereby . . . [Defendant] would retain ownership and profits from the [Defendant's] system."

Defendant argues that the Permit requires physical connection, *i.e.*, an interconnection, pointing to the requirements: "[Defendant] shall be responsible for submission of plans and specifications for the connection to the regional sewer system[,]" and "[Defendant] will connect to the regional sewer system and cease the discharge into the Saluda River." ECF No. 58-1 at 26. Defendant further points to the 208 Plan, which states as a general rule "[w]hen a regional wastewater collection system, public or private, becomes available, these facilities will be

required to **connect** to that system." ECF No. 58-1 (citing ECF No. 7-6 at 44) (emphasis in original).

Looking at the entirety of paragraph 3(c), Plaintiff asserts that the sentence cited by Defendant are "merely explanatory phrases that do not modify the connection requirement." ECF No. 62 at 4. The court finds Plaintiff's arguments accurately reflect the terms of the NDPES Permit. Paragraphs 3(a) and 3(b) place the onus on Defendant to seek connection—Defendant is required to submit plans for connection and begin construction of the connection. Further, in 1998, Defendant appeared to understand that the onus was on Defendant to connect, as demonstrated by Defendant seeking and receiving a construction permit in 1998 to connect the I-20 Plant. ECF No. 65-5. Defendant sought the construction permit even though there was no connection agreement in place. *See id.* Defendant's current argument conflicts with the 208 Plan. The 208 Plan clearly states that temporary facilities, such as Defendant, must "consolidate" with a regional system. DHEC has repeatedly required Defendant to connect to the regional system and cease discharging. There are numerous ways to connect to the facility. The court finds "connect" does not mean on Defendant's terms, nor does it infer that Defendant will have a continuing role after connection is made.

(2) Available

Plaintiff understands the term "available" to mean physically available. Defendant understands the terms to mean contractually available. In 2000, DHEC charged Defendant with violating the terms of the permit, namely failure to connect to the regional system when it became physically available. *Carolina Water Service*, 2002 ALC Decision at *1. The ALC Court held that the system was not available to Defendant, deferring to CMCOG's determination that Defendant was in compliance with the NDPES permit. *Id.* at 6. However, the court also found

that Defendant should have submitted whatever contract it could negotiate to have "at least attempted to reach an acceptable and timely agreement." *Id.* at 7. Additionally, the ALC court held that if PSC did not approve of the agreement, Defendant's permit would expire after 180 days. *Id.* at 10. The Board modified the 2002 ALC Decision by instituting a new compliance schedule that merely required Defendant engage in "ongoing negotiations."

DHEC recently revoked Defendant's NDPES permit. ECF No. 64-1 at 1. DHEC explained that Defendant has a "permit which requires connection to a regional sewer system . . . under the water quality management plan under section 208 of the CWA [Defendant] is ineligible for reissuance of a permit once notified by the Department that a regional sewer system is operational." ECF No. 64-1 at 3. DHEC equates the term "available" with "operational," meaning that the regional treatment is operating and physically available for connection. The "permit author['s]" interpretation is significant when determining ambiguous permit terms. *See Northwest Envt'l Advocates v. City of Portland*, 56 F.3d 979 (9th Cir. 1995). The court finds that the term "available" means physically available.

In conclusion, the court finds that Defendant was required to physically connect to the regional system, in any manner possible, when it became physically available in 1999.

>        *ii.    Strict Liability*

The CWA is a strict liability statute. ECF No. 57 at 20; *see Piney Run*, 268 F.3d at 265. Accordingly, the "reasonableness or bona fides of an alleged violator's efforts to comply with its permit is not relevant in determining whether a violator is liable under the [CWA]." *Friends of the Earth Inc. v. Laidlaw Environmental Servs.*, 890 F. Supp. 470, 496 (D.S.C. 1995).

>   In determining the amount of a civil penalty the court shall consider the
>   seriousness of the violation or violations, the economic benefit (if any) resulting
>   from the violation, any history of such violations, any good-faith efforts to

comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.

33 U.S.C. § 1319(d). Generally, a fine must be imposed; however, the district court has discretion in the amount fined. *Stoddard v. Western Carolina Regional Sewer Auth.*, 784 F.2d 1200, 1208 (4th Cir. 1986). The court may take into account whether "levying [] statutory penalties would merely diminish the resources available to correct the problems caused by the discharge." *Id.* The court first considers the seriousness of the violation. The court finds that the sewage discharge is a serious violation. Next, the court calculated the economic benefit Defendant made on the I-20 Plant between 2009 and 2013, which averaged $689,000 per year. *See* ECF No. 58-8 at 8-11. Third, Defendant has violated its permit for over seventeen years; however, only recently have any person or group undertaken an enforcement action. The last enforcement action ended in 2002. In 1998, Defendant initially attempted to comply with the permit; however, Defendant failed to undertake any attempt to comply with the permit between 2002 and 2014. Lastly, Defendant will need to undertake costs to correct the problems caused by its failure to fulfill the permit requirements. Taking the above into consideration, the court orders a fine in the amount of $1,500,000.

## B. Claim III: Violation of Effluent Limitations

Plaintiff moves for summary judgment on Claim III. The court finds that there is no genuine issue of material fact that Defendant violated its effluent limitations twenty-three times since 2009.[7] However, Defendant argues there is a genuine issue of material fact whether Defendant qualifies for an "upset defense." An upset defense is an affirmative defense for

---

[7] Defendant exceeded its effluent limitations February 2009 (1), April 2009 (1), June 2009 (1), April 2010 (2), September 2010 (1), April 2011 (3), September 2011 (1), February 2012 (1), April 2012 (1), August 2012 (1), January 2013 (1), February 2013 (1), April 2013 (3), May 2013 (1), July 2013 (1), August 2013 (1), February 2014 (1), January 2015 (1), October 2015 (1), and November 2015 (1). ECF Nos. 1-3; 57-8 at 6; 57 at 22.

liability for noncompliance with an NDPES permit requirement. Defendant has the burden of proof to show:

> [A]n exceptional incident in which there is unintentional and temporary noncompliance with technology based permit effluent limitations because of factors beyond the reasonable control of the permittee. An upset does not include noncompliance to the extent caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventative maintenance, or careless or improper operation.

40 C.F.R. § 122.41(n)(1); S.C. Code Ann. Regs. 61-9.122.41(n)(1). To claim a defense of upset, the Defendant must show compliance with the oral notice or written submission requirements. S.C. Code Ann. Regs 61-9.122.41(n). South Carolina requires oral notice to DHEC within twenty-four hours and a detailed written submission within five days. S.C. Code Ann. Regs. 61-9.122.41(*l*)(6)(i). Specifically, the Defendant must demonstrate:

> Through properly signed contemporaneous logs, or other relevant evidence that:
> (i)    An upset occurred and that the permittee can identify the cause(s) of the upset;
> (ii)   The permitted facility was at the time being properly operated; and
> (iii)  The permittee submitted notice of the upset as required in paragraph (*l*)(6)(ii)(B) of this section (24 hour notice).
> (iv)   The permittee complied with any remedial measures required under paragraph (d) [(duty to mitigate harm)] of this section.

S.C. Code Ann. Regs. 61-9.122.41(n)(3). The notice submitted to DHEC shall include (1) description of noncompliance and its cause, (2) period of noncompliance, including exact dates and times, (3) if noncompliance has not been corrected, the anticipated time it is expected to continue; and (4) steps to reduce, eliminate, and prevent reoccurrence. S.C. Code Ann. Regs. 61-9.122.41(*l*)(6). The written report may be waived by DHEC if an oral report is received within twenty-four hours. *Id.*

Plaintiff argues that Defendant did not follow proper procedures; therefore, cannot assert an upset defense. Defendant stated that its monitoring procedures consist of: (1) third party

testing, (2) if there's an effluent violation the "operator of the I-20 Plant fills out an excursion report noting any known condition that may have contributed to the exceedance," (3) takes steps to correct the exceedance, and (4) reports the exceedances on the monthly reports submitted to DHEC. ECF No. 60-3 at ¶ 6. If the exceedance is ongoing and poses a threat to public health, Defendant will immediately report to DHEC. *Id.* Defendant summarized the exceedance explanations submitted to DHEC in the DMRs. *Id.* Defendant alleged issues with high algae bloom, seasonal turnover, defective "sonic unit," excessive rainfall, extreme winter weather conditions, and maintenance to the sewer main. *Id.* at ¶ 8. Defendant has not shown that it met the requirement to report in twenty-four hours/five days. As Defendant fails to show there is a genuine issue of material fact that it met reporting requirements to claim an upset defense, the court grants Plaintiff's motion for summary judgment on Claim III. As explained above, CWA is a strict liability statute. For each effluent violation, Defendant is fined $1,000, totaling $23,000.

## IV.     CONCLUSION

Based on the foregoing, Plaintiff's motion for summary judgment **is granted.** Defendant's motion for summary judgment **is denied**. For the reasons stated above, the court fines Defendant $1,500,000 for Defendant's failure to connect to the regional system and $23,000 for Defendant's violation of the effluent limitations, totaling $1,523,000. The fine shall be paid to the United States Treasury. *Gwaltney of Smithfield Ltd.*, 484 U.S. at 53 (finding that "[i]f a citizen prevails in such an action, the court may order injunctive relief and/or impose civil penalties payable to the United States Treasury. [33 U.S.C.] § 1365(a).")

GOOD CAUSE HAVING BEEN SHOWN THEREFORE, IT IS ORDERED that effective April 1, 2018, Defendant Carolina Water Service, Inc. a South Carolina Corporation, its directors, principals, officers, agents, servants, employees, representatives, successors, and

assigns, and all those acting in concert or participation with them shall be, and hereby are,

PERMANENTLY ENJOINED and restrained from:

(1)    discharging any treated or untreated waste water into the Saluda River; and

(2)    must connect to a regional waste water treatment plant, in any manner, in

accordance with the 208 Plan.


s/ Margaret B. Seymour
The Honorable Margaret B. Seymour
Senior United States District Court Judge

March 29, 2017
Columbia, South Carolina